E-FILED
Monday, 17 August, 2020  02:48:56 PM
Clerk, U.S. District Court, ILCD

**IN THE**
**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**
**PEORIA DIVISION**

JAMIE C., on behalf of J.F.,
        Plaintiff,

v.                                                    Case No. 1:19-cv-01147-JES-JEH

COMMISSIONER OF SOCIAL
SECURITY,
        Defendant.

**Report and Recommendation**

Now before the Court is the Plaintiff's Motion for Summary Judgment (Doc. 17), the Defendant's Motion for Summary Affirmance (Doc. 17), and the Plaintiff's Reply (Doc. 19). This matter has been referred for a report and recommendation. The Motions are fully briefed, and for the reasons stated herein, the Court recommends the Plaintiff's Motion for Summary Judgment be denied and the Defendant's Motion for Summary Affirmance be granted.[1]

**I**

Jamie C. filed an application for supplemental security income (SSI) on behalf of her minor son, J.F., in February 2011. Jamie alleged J.F.'s disability began on the day he was born, November 12, 1998. After the claim was denied initially and upon reconsideration, a hearing was held before an Administrative Law Judge in November 2012. Although she was informed of the right to representation, Jamie chose to proceed without the assistance of an attorney or other representative. Both Jamie and J.F. testified at that hearing. In December 2012, the

---

[1] References to the pages within the Administrative Record will be identified by AR [page number]. The Administrative Record appears at (Doc. 10, 11) on the docket.

1

Administrative Law Judge issued an unfavorable decision which Jamie then appealed. The Appeals Council (AC) denied her request for review in April 2014. Jamie then filed a lawsuit in this Court in June 2014 which ultimately resulted in a remand to the Social Security Administration (SSA).

Another hearing was held before a different Administrative Law Judge, the Honorable Shreese M. Wilson (ALJ), in March 2016. Jamie was again informed of the right to representation and again chose to proceed on behalf of J.F. without it. Jamie, J.F., and J.F.'s father testified at the hearing. At the time of that hearing, Jamie declined to sign authorization forms so that updated medical and school records could be obtained. The ALJ issued an unfavorable decision in July 2016 based upon the reconsideration of evidence through December 4, 2012 (the date of the original unfavorable decision). In the July 2016 decision, the ALJ noted that due to lack of cooperation, a proper evaluation of disability after December 4, 2012 could not be conducted. Jamie appealed the unfavorable decision and the AC remanded finding that refusal to cooperate was not a basis for not making a finding on the severity of impairments since December 5, 2012. The AC explained in its remand order, however, that "the claimant and his representative have a duty to assist the ALJ in developing the record, including complying with requests for information or evidence[.]" AR 1394-95.

On May 4, 2018, ALJ Wilson held a third hearing pertaining to J.F.'s SSI claim. At that time, J.F. was an adult (he turned 18 on November 12, 2016) and so the ALJ informed him of his right to representation.[2] Upon the advice of his

---

[2] In *Elustra v. Mineo*, the Seventh Circuit Court of Appeals noted that "parents may bring claims *pro se* on behalf of their children in an effort to secure social security benefits." 595 F.3d 699, 705 (7th Cir. 2010) (citing *Machadio v. Apfel*, 276 F.3d 103, 106-08 (2d Cir. 2002)). The Court notes that at the time Jamie filed the instant civil action, J.F. was no longer a minor child. However, the Commissioner does not take issue with Jamie continuing to litigate *pro se* on behalf of her adult son, and so the Court similarly takes no issue with that fact. *See U.S. v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) (explaining that "Courts are

mother, J.F. chose to appear and testify without the assistance of an attorney or other representative. J.F., Jamie, and a vocational expert (VE) testified. Following that hearing, J.F.'s claim was denied on June 11, 2018. Jamie filed the instant civil action on behalf of J.F. seeking review of the ALJ's June 2018 Decision on April 30, 2019.

## II

At the May 2018 hearing, J.F. testified he was 19 years old and lived in a house with his parents and grandparents. He did not have a driver's license as he believed he would not be able to learn how to drive, though he had never tried. He confirmed he was in special education classes all four years of high school. Jamie testified that J.F. was placed in a one-on-one emotional disability classroom and he dressed for physical education (PE) in the nurse's station because he could not go to the locker rooms. Jamie explained that J.F. only graduated at the eighth grade level, but confirmed J.F. received a high school diploma. He did not want to go to college because he had trouble in high school and thought it not worth the trouble. Jamie questioned how her son would take going through the hallways at college "with all those people, and all those sounds when he can't even go to a restaurant." AR 1179. He had not tried to look for work as "I know I won't be able to hold [a job]." AR 1162. He said his sensory issues and "messed up" sleep schedule kept him from holding a job. *Id*. Jamie did not take medicine and did not see a doctor. Jamie added that they tried medication with J.F. when he was younger but there were too many side effects.

J.F. elaborated on his sensory issues, testifying that light made him "kind of" pushy and irritable, and sound made him "kind of" nervous and pushed him

---

essentially passive instruments of government . . . They do not, or should not, sally forth each day looking for wrongs to right. They wait for cases to come to them, and when cases arise, courts normally decide only questions presented by the parties") (internal quotations omitted).

"away from the general area if the noise level is too high." *Id.* Jamie interjected that his sensory issues were triggered "[e]specially [with] change in environment." AR 1163. J.F. added that his sensitivity to sound made him "a little bit aggressive." *Id.* He said his nervous energy made him annoy others in that they would get up and walk away from him. He said he caused that annoyance to others over 100 times in one year. J.F. added that he had touch issues as well and if something came into contact with his skin, it "rile[d]" him up. AR 1165. Jamie explained J.F. was diagnosed in seventh grade and re-diagnosed in the most updated records with sensory integration disorder, or sensory modulation disorder. Per Jamie, J.F. did not take any medication for that disorder because there was not any except for controlling the environment. J.F. took supplements and he mostly stayed in one room where the lights and sound were controlled, and "stuff" was not moved around. AR 1166. J.F. stated that doing all those things was not enough to fully control his disorder. Jamie stated J.F.'s ability to do "stuff" was dependent upon his environment. AR 1171. Jamie also testified J.F. was a "ticking time bomb" when his sensory issues were set off. AR 1181. She described one incident when J.F. "just went off" about a toothbrush and Jamie called the police. After the police came to their house and told J.F. to calm down, he "shaped up, never did it again." AR 1184.

Jamie also testified that J.F. was "tactile defensive" as part of his sensory issues; "it's basically where you're constantly on guard, like you're in a high – it's kind of like a fight or flight response." AR 1173. Jamie stated J.F.'s sleep issues were triggered by his tactile defensiveness as he was constantly on guard. According to Jamie, the school psychologist told them there was no medication to treat J.F.'s tactile defensiveness. Though J.F. was not on ADHD medication when he was in school, he was able to get his school work done and graduate, "but barely." AR 1176.

4

J.F. testified that he occupied his time playing video games on his PlayStation 4 or his computer. He played the games by himself as he did not have the PlayStation network. Friends "very, very rarely" came over to play the games with J.F. Jamie commented J.F.'s good friend last came over about seven months before the hearing. Because of his sensory issues, J.F. always turned the volume down on his games. J.F. said he got bored sometimes playing video games all day. He thought he could play video games all day but not work because "games and real life work are absolutely two different things." AR 1188. Jamie said he could play video games all day because he was in a controlled environment. J.F. said he hated to leave his house and was "basically dragged" out of the house to come to the hearing. AR 1189. Upon the ALJ pointing out that he seemed calm and okay during the hearing, J.F. said he way trying to be okay. According to J.F., he wanted to make YouTube videos but did not have the right recording software to do it. According to Jamie, J.F. did not understand it though others tried teaching it to him.

Jamie added that in order for J.F. to function in a one-on-one classroom, he still had to have several accommodations including a scribe for longer assignments, frequent breaks, small group administration, oral written directions, frequent redirection, and notification when there was a change in routine schedule. She again testified that there was nothing else to do except try to control J.F.'s environment to stop certain behaviors from occurring. She confirmed J.F. did not go to a psychiatrist or psychologist outside of the school setting because "all of his needs were being met at school." AR 1194.

The ALJ then questioned the VE. The VE was asked to consider the following hypothetical individual:

> An individual that's the same age that the claimant is. So this individual is 19. This individual has no exertional, postural,

5

manipulative or environmental limitations.  However, this individual would be limited to tasks that can be learned within 30 days that are routine in nature.

This individual should be in an environment that's low stress in nature.  I'm going to define low stress as no more than occasional decision making or changes in a work setting.  So every day when they go to work they know what their work tasks are, and they're basically unchanging.

Additionally, this individual should be in an environment that the production expectations are shift or day-based.  There should be no hourly production quotas for this individual.  This individual should be in an environment that requires no more – no interaction with the general public, and no more than occasional interaction with coworkers or supervisors.

AR 1195-96.  The VE identified a variety of jobs such a hypothetical individual could perform at the medium unskilled level, the light unskilled level, and the sedentary unskilled level.  The ALJ added to the hypothetical that the individual needed to avoid concentrated exposure to excessive noise.  The VE testified that jobs remained, though numbers of jobs were reduced.  Next, the ALJ added that the individual needed to be in an environment where the tasks could be easily resumed after momentary distraction.  The VE responded that all those jobs would "meet the standard of being able to be usually be [sic] done."  AR 1198.  The ALJ added further limitation that the hypothetical individual needed to be in an environment that did not require tandem tasks.  The VE testified the jobs remained.  The VE testified all jobs would be eliminated if the individual became distracted and lost 15 percent productivity above normal work expectations on a regular and continuing basis.  The individual's ability to maintain the identified jobs would not be affected if the individual would need a supervisor to come by on an hourly basis every day, eight hours a days, five days a week to make sure that the tasks were being performed and performed to industry standard.  The individual would not be able to maintain employment beyond a few months if he

routinely had unscheduled absences two days per month. Finally, if the individual were set off at work and became frustrated and upset and reached the point where it affected others or his own ability to meet productivity standards, employment would be eliminated.

### III

The record the ALJ considered included evidence dated between 2004 and 2018. The plethora of record evidence discussed included: J.F.'s IQ scores; his Individualized Educational Plans (IEP) from several years; the testimony at all three hearings; J.F.'s grades transcripts; his withdrawal from school to be homeschooled and his return to school; his school attendance records; various intelligence test results; the reasons for his placement in special education; and his school disciplinary records. The ALJ further considered: disability reports; teachers' observations of J.F. throughout his school years; the accommodations put into place to assist J.F. and the improvement or lack of improvement from those; J.F.'s behavioral issues and the circumstances under which they improved; services J.F. received at school for his learning and behavioral issues; and J.F.'s improvement at school during particular spans of academic years. The ALJ throughout the Decision pointed out inconsistencies between testimony and record evidence as well as the lack of medical records from more recent years.

In her consideration of functional equivalence for purposes of J.F.'s childhood disability claim, the ALJ addressed the State Agency psychological consultants' May and September 2011 opinions. Those State Agency psychologists found: less than marked limitation in the first functional domain; less than marked limitation in the second functional domain; one consultant found marked limitation and one found no limitation in the third functional domain; no limitation in the fourth functional domain; less than marked limitation in the fifth functional domain; and one consultant found less than marked limitation and the

other found no limitation in the sixth and final functional domain. The ALJ found J.F. had less than marked limitation in all but the third functional domain, where she found marked limitation.

## IV

Jamie, on behalf of her son, states her arguments as follows: 1) "the ALJ errored [sic] at step 2 finding for Children and Adult, by improperly interrupting [sic] non-medical evidence as medical and medical as non-medical;" 2) the "ALJ did not discuss all medically diagnosed conditions and improper weight given"; 3) "the ALJ used regulations that were no longer applicable;" 4) "the ALJ went into the forbidden array [sic] of playing Dr. by substituting her own opinion for that of a Dr.;" 5) "the ALJ errored [sic] at step 3 by combining both medical and functional equivalency because medical was listed as non-medical;" 6) "the ALJ does not give specific reasons for not giving weight to certain evidence;" 7) "the ALJ did not do a combined impairment assessment, as the whole child approach is required;" 8) "the ALJ asked the Vocab [sic] expert hypothetical questions that the claimant has evidence he cannot do;" and 9) "Social Security did not send over the claimant's medical and functional records to the examining consultant." Plf's MSJ (Doc. 17 at pg. 18).

"The final determination of the Commissioner of Social Security after a hearing under [42 U.S.C. § 1383(c)(1)] shall be subject to judicial review as provided in section 405(g) of [Title 42] to the same extent as the Commissioner's final determinations under section 405 of [Title 42]." 42 U.S.C. § 1383(c)(3). Pursuant to 42 U.S.C. § 405(g), the Commissioner's findings must be sustained by the Court if they are supported by "substantial evidence." 42 USC § 405(g). The Court's function on review is not to try the case de novo or to supplant the ALJ's findings with the Court's own assessment of the evidence. *See Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000); *Pugh v. Bowen*, 870 F.2d 1271 (7th Cir. 1989). Indeed,

"[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Although great deference is afforded to the determination made by the ALJ, the Court does not "merely rubber stamp the ALJ's decision." *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). The Court's function is to determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied. *Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). Substantial evidence is defined as such relevant evidence as a reasonable mind might accept as adequate to support the decision. *Richardson v. Perales*, 402 U.S. 389, 390 (1971), *Henderson v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999).

## A

Under the Social Security Act, an individual under the age of 18 is considered disabled if he "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). There is a three-step process used to decide whether a child is disabled. *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 785 (7th Cir. 2003). First, the ALJ must determine whether the claimant is engaged in substantial gainful activity. 20 C.F.R. § 416.924(a). If not, the ALJ must next determine whether the claimant has a medically determinable impairment that is "severe" or combination of impairments that are "severe." *Id*. If the claimant does have an impairment or combination of impairments that are "severe," the ALJ next must finally determine whether the claimant has an impairment or combination of impairments that meets or medically equals the severity of a listing or that functionally equals the listing. *Id*.

1

Jamie argues that at Step Two, the ALJ erred by ignoring "300 + pages" of new "medical" evidence added to J.F.'s record, and the ALJ did not include all medically diagnosed conditions where the ALJ rejected medical evidence of J.F.'s "other health impairment" and his sensory related neurological problems. The Commissioner counters that Jamie merely reweighs the evidence and does not explain why substantial evidence did not support the ALJ's Decision at Step Two.

In her June 2018 Decision, the ALJ explained that no new evidence was presented to call into question the prior ALJ's determination that learning disorder, asthma, and vitamin deficiencies were J.F.'s medically determinable impairments, whereas Asperger's and autism were *not* medically determinable impairments. AR 1067. The ALJ relied upon the previous ALJ's consideration of evidence and finding in December 2012 that where there was no medically determinable evidence and no diagnosis established based on such evidence by an acceptable medical source such that J.F. did not suffer from the medically determinable impairments of autism, Asperger's, ODD, or PDD. AR 1065. Jamie argues the prior ALJ's error in failing to label Asperger's a medically determinable impairment carried through to the June 2018 Decision even in light of new medical records confirming that diagnosis.

She is mistaken as to what this Court determined as to the prior ALJ's December 2012 decision. This Court found the prior ALJ fulfilled her obligation to build a logical bridge from the evidence to her conclusion at Step Two and any error the ALJ committed at that step was harmless because the ALJ would have discussed the same evidence she did discuss in finding that J.F. had a severe impairment of a learning disorder. This Court explained, "Had [the prior ALJ] found Asperger's of autism to be medically determinable impairments, the ALJ's finding would have been based upon consideration of the same evidence." AR 1323. This Court went on to explain the prior ALJ discussed in sufficient detail

evidence of Asperger's and autism provided by several sources. *Id.* Jamie's challenge at this time suffers the same fate; any error the ALJ committed at Step Two in the June 2018 Decision was harmless as the ALJ proceeded to the next step. *See McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011) (explaining that administrative error may be harmless and thus a court ought not remand a case to the ALJ where it is convinced that the ALJ would reach the same result); *see also J.B. by Pena v. Commissioner of Social Security Administration*, No. 17-CV-193, 2018 WL 1411233, at *4 (E.D. Wis. Mar. 20, 2018) (finding that any error by the ALJ in failing to mention the child's additional disorders harmless "because he found at least one severe impairment and, therefore, continued to the next step in the sequential evaluation process") (citing *Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012)).  Proceeding to Step Three of the process, the ALJ considered that new evidence (see below) at length to determine whether J.F.'s impairments of learning disorder and vitamin deficiencies met, medically equaled, or functionally equaled a listing.  In any event, while Jamie says there are over 300 pages of new medical evidence, those documents are more recently dated education records which repeat what J.F.'s education records provided previously:  J.F. had "significant behavior issues which appeared to be related to his educationally-based diagnosis of Asperger's syndrome."  *See* AR 1837 (referring to J.F.'s re-evaluation for specific learning disability on 11/20/10).  The particular record Jamie highlights as showing J.F.'s school psychologist agreed with the diagnosis of Asperger's is nothing more than an Individualized Education Program (Conference Summary Report) with the signature of J.F.'s school psychologist as a participant in the conference.

It was similarly harmless error for the ALJ to fail to identify as a severe medically determinable impairment J.F.'s sensory modulation disorder.  The ALJ specifically addressed J.F.'s statement at his January 2018 consultative

psychological evaluation that he had sensory modulation disorder. The ALJ pointed out that the consultative examiner, Tomike Lana, PsyD, CADC, did not set forth such a diagnosis. The ALJ also pointed out that both Jamie and J.F. testified that the latter had been diagnosed with "sensory integration disorder/sensory modulation disorder." The ALJ considered J.F.'s occupational therapy evaluations dated September 2010 and November 2016, both of which included a Sensory Profile School Companion Teacher Questionnaire (Profile). Occupational therapist (OT) Vicki Clark commented in 2010 that the Profile indicated J.F. had difficulty with sensory modulation affecting attention and behavior in the classroom and she discussed various difficulties he might experience and various accommodations/intervention strategies that teachers might utilize. The 2016 occupational therapy note provided that, per the Profile completed that year, J.F. demonstrated a definite difference in one of four school factor areas, had challenges with sensory sensitivity which appeared to limit his participation in school activities due to noise or being uncomfortable with messy items, and had difficulty adapting to changes in routine or environments.

The ALJ took issue with the fact that it appeared the OTs did not do any independent evaluation of J.F. with respect to any possible sensory issues in 2010 or 2016, and the fact that the 2016 evaluation also included a self-assessment by J.F. The ALJ therefore rejected sensory modulation disorder as a medically determinable impairment because, "Neither a teacher assessment nor the claimant's self-assessment are sufficient to establish the existence of a medically determinable impairment." AR 1066. The ALJ's articulated reasons for rejecting as a severe medically determinable impairment sensory modulation disorder permits the Court to trace the path of her reasoning. *See Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (stating that an ALJ must "sufficiently articulate his assessment of the evidence to assure us that the ALJ considered the important

evidence . . . and to enable us to trace the path of the ALJ's reasoning"). Even assuming the ALJ would have found such an impairment at Step Two had she found the assessments were done by the OTs as acceptable medical sources, no harm ultimately came to J.F. At Step Three, the ALJ exhaustively and repeatedly discussed evidence pertaining to J.F.'s sensory issues.

### 2

In her 90-page brief, Jamie next takes issue with the ALJ's Step Three analysis for several reasons including that the ALJ considered old regulations, improperly weighed certain evidence, ignored objective medical evidence, and again "mixed" the medical and functional equivalence inquiries. She spends much of her time re-stating portions of record evidence and the ALJ's June 2018 Decision. While understandable that Jamie wishes to nitpick nearly every discussion of the record evidence and conclusion the ALJ made in her Decision denying J.F.'s disability claim, the Court cannot and will not engage with the evidence anew. *See Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (explaining that in reviewing an ALJ's decision, the court cannot reweigh evidence, resolve conflicts in the record, decide questions of credibility, or otherwise substitute its own judgment for that of the Commissioner). It must simply ensure the ALJ's Decision is supported by substantial evidence and is free of legal error. *Delgado*, 782 F.2d at 82. The Court must give the Decision "a commonsensical reading rather than nitpicking at it" in analyzing for fatal gaps or contradictions. *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000). The U.S. Supreme Court recently explained what amounts to "substantial evidence" in the Social Security context:

> Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficient evidence to support the agency's factual determinations . . . And whatever the meaning of substantial in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court

> has said, is more than a mere scintilla . . . It means—and means only—
> such relevant evidence as a reasonable mind might accept as adequate
> to support a conclusion.

*Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal quotations and citations omitted).  Here, the Court finds the ALJ's 78-page Decision is supported by substantial evidence and free of harmful legal error.

As an initial matter, the ALJ did not commit error by applying "old" regulations as Jamie argues where the ALJ obviously did so for the sake of completeness and to fully abide by the Court's 2015 remand opinion.  The ALJ explained in her Decision that the primary reason this Court remanded the December 2012 decision was that the ALJ failed to separately consider whether J.F. medically equaled or functionally equaled Listing 112.02 (Organic mental disorders); however, that listing was no longer the appropriate listing to consider as Listing 112.11 (Neurodevelopmental disorders) became the relevant one following revision of the mental impairments Listings in 2017.  The ALJ further explained, "[B]ecause the Court decision specifically references Listing 112.02, the undersigned has considered Listing 112.02 as it existed at the time of the Court decision and current Listing 112.11."  AR 1068.  As for the ALJ's application of the criteria for Listings 112.02 and 112.11, the ALJ sufficiently supported with record evidence her finding that the Listings were not met, medically equaled, or functionally equaled.

**a**

To meet or medically equal Listing 112.11, both paragraphs A and B of that Listing must be satisfied:

A. Medical documentation of the requirements of paragraph 1, 2, or 3:
1. One or both of the following:

a. Frequent distractibility, difficulty sustaining attention, and difficulty organizing tasks; or

b. Hyperactive and impulsive behavior (for example, difficulty remaining seated, talking excessively, difficulty waiting, appearing restless, or behaving as if being "driven by a motor").

2. Significant difficulties learning and using academic skills; or

3. Recurrent motor movement or vocalization.

AND

B. Extreme limitation of one, or marked limitation of two, of the following areas of mental functioning:

1. Understand, remember, or apply information.

2. Interact with others.

3. Concentrate, persist, or maintain pace.

4. Adapt or manage oneself.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 112.11. Here, the ALJ determined the paragraph A criteria of Listing 112.11 were satisfied but the paragraph B criteria were not satisfied because J.F. had only one (not the requisite two) marked impairment – in concentration, persistence, or maintaining pace – and no extreme limitation in the areas of mental functioning.

The ALJ found J.F. had "moderate" impairment in understanding, remembering, and applying information as the evidence suggested he had some significant cognitive deficits. Jamie takes issue with the ALJ's conclusion that J.F.'s ability to learn and succeed in class was compromised by his behavior and attendance issues. She cites to a November 2010 record which indicated that although J.F. had poor attendance at school,[3] his fundamental learning delays appeared to be the primary factor contributing to his learning disability. That one note in the record does not undermine the ALJ's finding of moderate impairment in understanding, remembering, and applying information where the ALJ did not

---

[3] The ALJ's finding as to the impact of J.F.'s absenteeism on his grades is not without support in the record. While the November 2010 record said J.F.'s poor attendance was not the primary factor contributing to his learning disability, a February 2016 record stated, "Attendance significantly impacts [J.F.'s] academic performance." AR 1856.

ignore evidence contrary to her finding. *See Spicher v. Berryhill*, 898 F.3d 754, 757 (7th Cir. 2018) (stating that "an ALJ may not ignore evidence that undercuts [his] conclusion"). For instance, the ALJ noted IQ testing indicated Low Average to Average IQ, although school assessments suggested lower academic achievement than IQ testing would suggest. However, the ALJ also noted J.F.'s ability to obtain average grades and even As, Bs, or Cs on individual assignments in particular classes, and his academic performance improved when he was at school more consistently. She considered a November 2012 IEP which provided that James was a very capable student, but his behavior regularly impacted his academic career. She pointed out the significant improvement in J.F.'s scores between 2010 and 2016, although he was to be given a variety of accommodations/modifications, including receipt of oral and written directions, test items read to him, and the assistance of a scribe for longer assessments. Telling to the ALJ was J.F.'s testimony that he spent his time playing video or computer games, "suggesting he could understand and apply the rules/requirements of the games in order to progress towards the game goals." AR 1083. Thus, the ALJ considered the evidence which cut both ways but ultimately determined the weight of it more fully supported no more than moderate limitation in understanding, remembering, and applying information.

In support of her finding that J.F. had "moderate" limitation in interacting with others (social functioning), the ALJ found the evidence indicated J.F. had behavioral problems, but the evidence also suggested he could be generally well behaved when he wanted to be. The ALJ expressly considered evidence dated between November 2010 and May 2018. She highlighted that J.F. had no suspensions or detentions as of November 2012 which was a "significant improvement" over the prior school year, Jamie's testimony as to J.F.'s 23 pages of discipline records in the file was misleading as many of the pages related to the

same event and many involved J.F.'s tardiness (especially his last two years of high school), punishment for his use of profanity decreased to no punishment in his final year of school, and IEPs indicated J.F. could be polite and helpful. The ALJ also pointed out that school records stated J.F. enjoyed working with his classmates in a small group setting, and in that setting, J.F. was successful participating/focusing on activities or lessons. The ALJ determined those school records contradicted Jamie's testimony that J.F. had to be in a one-on-one classroom and her testimony that there was no way he could be around other students without becoming upset. The ALJ had "no doubt the claimant has some sensory issues that impact social functioning," but J.F.'s school records did not demonstrate extreme difficulties alleged by J.F. and his mother; those school records did not support that J.F. acted violently when his sensory issues were set off. The ALJ concluded that, instead, the evidence suggested J.F. was capable of comporting himself generally, especially when in a setting where interaction with others was more limited.

The ALJ supported her finding of J.F.'s "marked" limitation in concentration, persistence, or pace with evidence of, among other things, a very serious problem working without distracting himself or others, serious problems focusing long enough to finish assigned activities or tasks, a constant need for praise and attention, need for a high level of structure and frequent breaks to complete his lessons, and his annoyance caused by the repetition of the task loading and unloading the washer or dryer. On the other hand, there was evidence that he worked hard on completing tasks in a small group setting, his focus had significantly improved since the beginning of his freshman year, he could be brought back to task by asking him a question, and he spent his time playing video or computer games. The foregoing evidence cited by the ALJ supports her conclusions that J.F. could persist with tasks that he enjoyed, that

17

school records suggested improvement in task completion in late 2016 though he continued to receive a variety of accommodations to help him concentrate and persist with tasks, and that:

> The overall evidence of record suggests that with rare exceptions, such as the video or computer games, the claimant has considerable difficulty maintaining concentration, persistence, or pace on typical daily tasks and on his school work without accommodations and that his problems with attention and task completion at school significantly compromise his already diminished academic abilities.

AR 1080.

In support of her finding that J.F. has a "moderate" limitation in adapting or managing himself, the ALJ considered evidence that J.F. was capable of dressing, bathing, and feeding himself and Jamie's 2012 testimony that she had to remind J.F. to wash certain areas of his body. The ALJ also considered that J.F.'s high school records did not appear to indicate any significant issues with personal hygiene or any appreciable difficulty being aware of and avoiding hazards. However, teachers indicated J.F.'s varied levels of difficulty handling his emotions, and the 2016 Sensory Profile provided J.F. had challenges with sensory sensitivity which appeared to limit his participation in certain school activities due to noise or being uncomfortable with messy items and he had difficulty adapting to changes in routines or environments. Yet again, the ALJ did not consider just one line of evidence. She simultaneously considered evidence of J.F.'s accommodations/modifications due to his sensitivity as to environment and routine and also evidence of his demonstrated awareness of his challenges and preference to avoid uncomfortable situations. She considered J.F.'s testimony that light could make him pushy and irritable and noise could make him pushy and aggressive and juxtaposed that testimony with evidence that he did not go to the doctor to see if anything could be done about his tactile defensiveness and

evidence that did not support J.F. acted violently when his sensory issues were set off.

**b**

Contrary to Jamie's contention, the ALJ in the June 2018 Decision did not repeat the prior ALJ's error by conflating the medical equivalence and functional equivalence analyses. After explaining why J.F.'s impairments did not medically equal Listings 112.02 or 112.11 (as discussed above), the ALJ separately considered and explained why his impairments did not functionally equal the Listings. The Commissioner argues that the ALJ explained J.F.'s school records, Jamie's and his testimony, and the medical evidence did not substantiate the representations as to J.F.'s limitations. The Commissioner further points out that the ALJ either relied on or augmented the conclusions from the State Agency medical consultants, "highly qualified and experts in Social Security disability evaluation," who reviewed the record and found that J.F. did not functionally equal a listing. Dft's MSA (Doc. 18-1 at pg. 6) (quoting 20 C.F.R. § 404.1513a and collecting cases). To find that an impairment functionally equals a listing, the ALJ must assess the claimant's functioning in terms of six domains: 1) acquiring and using information; 2) attending and completing tasks; 3) interacting and relating with others; 4) moving about and manipulating objects; 5) caring for yourself; and 6) health and physical well being. 20 C.F.R. § 416.926a. To functionally equal the Listings, the claimant's impairment or combination of impairments must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. *Id*. Before the ALJ addressed each of the six domains, she detailed the following evidence: Jamie's testimony at all three hearings; J.F.'s testimony at all three hearings; J.F.'s father's testimony at the second hearing; J.F.'s school records which documented significant cognitive deficits, some behavioral issues,

and very significant problems with concentration and task completion; and J.F.'s special education services.

In all but one domain – attending and completing tasks – the ALJ determined J.F. had less than marked limitation. Throughout her Decision, the ALJ detailed the evidence of J.F.'s constant participation in special education classes, his academic deficits, his poor performance in certain years compared with improved performance in others, his receipt of special aids/accommodations in school, observation that J.F. was a very capable student, observations that J.F.'s behavior impacted his academic career, his limited social skills, and statements that attendance significantly impacted J.F.'s academic performance. The ALJ also detailed Jamie's testimony that J.F. melted down in response to stress and J.F. had sensory modulation disorder as well as tactile defensiveness, J.F.'s testimony that changes in the environment bothered him, and J.F.'s father's testimony that J.F.'s performance of even simple tasks required redirection. In her consideration of each of the six domains, the ALJ contrasted the evidence of J.F.'s deficits with evidence of improvement under certain conditions, where J.F. exhibited strengths, and when he engaged in conduct that showed capabilities beyond those alleged.

For instance, in the domain of acquiring and using information, the ALJ pointed out: in November 2012 an IEP showed J.F. had some ability to handle grade-level material, albeit with a variety of supplemental aids/assistance; he acknowledged at the 2012 hearing that he was capable of performing at a higher level if he would only apply himself; improved grades with better attendance; his knowledge of how to perform basic household chores and ability to ride the bus home from school; he could learn and understand how to play video and computer games and apply that knowledge successfully; and school records did not substantiate J.F. needed the degree of instruction and monitoring alleged by his parents. In the domain of attending and completing tasks (in which the ALJ

found the only marked limitation), the ALJ determined the evidence indicated that when J.F. was given a task that was interesting or enjoyable he demonstrated very good attention and task completion. Nevertheless, J.F. had significant problems maintaining the necessary attention to complete those tasks expected of him on a regular basis such as attending to personal hygiene, performing household chores, and completing school assignments which were not "fun" or "enjoyable." AR 1105. Given the fact J.F. was placed in a highly structured setting for at least some of his classes and his receipt of special assistance or accommodation with continuing significant struggles, the ALJ determined J.F. had marked limitation in that domain. In the domain of interacting and relating with others, the ALJ pointed to IEPs that indicated J.F. could be very polite and was helpful and wanted to please, February 2016 records that indicated he successfully participated/focused on activities or lessons within the smaller group setting, and that school records did not support that J.F. acted violently when his sensory issues were set off or that there was no way he could be around other students without becoming upset.

In the domain of moving about and manipulating objects, the ALJ pointed out that the overall evidence indicated no mobility issues or significant manipulative deficits. The ALJ explained that a "less than marked" finding rather than the available "no limitation" finding was appropriate where occupational therapy records indicated J.F. had some handwriting delay although his writing was mostly average for his age. In the domain of caring for yourself, the ALJ emphasized that school records did not demonstrate the extreme difficulties J.F. and his mother alleged were caused by his sensory issues and did not support that there was no way J.F. could be around other students without becoming upset. The ALJ pointed to the Sensory Profiles dated 2010 and 2016 which demonstrated significant improvement in sensory issues in those six years. Finally, in the

21

domain of health and physical well-being, the ALJ considered J.F.'s 2018 hearing testimony that he was not seeing a doctor and was not taking any medication, Jamie's 2018 testimony that J.F. did have asthma but it was not something that really affected him, and Jamie's 2012 testimony regarding the frequency of J.F.'s common illnesses was not supported by the medical records, and even if he was ill as often as alleged, it was not significant enough for him to require medical care. The ALJ noted that while school records referenced J.F. has having a lot of health issues and missing school as a result, the records from J.F.'s primary care provider Jamie submitted in January 2018 ended in 2013. "Therefore, it does not appear that the claimant has gone to the doctor in years, suggesting that he has not experienced any significant physical health issues in recent years." AR 1121.

The Court has considered the entirety of the ALJ's Decision, the records relied upon by the ALJ, the records relied upon by Jamie, and the records as a whole. Jamie's various challenges to the ALJ's Decision find no support in the ALJ's articulation of the evidence and her findings. The ALJ did not impermissibly play doctor. The record was slim insofar as actual medical records. There were, as Jamie argues, school records which included the signatures of J.F.'s school psychologists and OTs. But the fact that the ALJ considered those records and did not find disability based upon them does not automatically mean she played doctor in her consideration of them or that she improperly labeled medical evidence non-medical. *See, e.g., Heather M. v. Berryhill*, 384 F. Supp. 3d 928, 935 (N.D. Ill. 2019) (stating the ALJ did not impermissibly play doctor but instead "'played' ALJ and considered and assessed one report from a 'medical source' along with the rest of the medical evidence in the 1000-page record"). The ALJ considered *at length* those school records and the pertinent information they provided. Throughout the Decision, the ALJ compared and contrasted the gamut of evidence, and in so doing, the ALJ built a logical bridge between the evidence

and her conclusions that J.F. did not meet, medically equal, or functionally equal the "old" and new Listings alike. *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("an ALJ need not mention every piece of evidence, so long he builds a logical bridge from the evidence to his conclusion"). That the ALJ compared and contrasted the gamut of evidence does away with any argument that she only considered and credited the evidence favorable to a *non*-disability finding. In the end, the ALJ's decision that J.F. was not disabled prior to attaining the age of 18 is supported by relevant evidence that a reasonable might accept as adequate to support that conclusion.

**B**

Under the Social Security Act, an individual who has attained the age of 18 is considered disabled if he "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). The establishment of disability under the Act is a two-step process.

First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment. *McNeil v. Califano*, 614 F.2d 142, 143 (7th Cir. 1980). The factual determination is made by using a five-step test. *See* 20 C.F.R. § 416.920. In the following order, the ALJ must evaluate whether the claimant:

1) currently performs or, during the relevant time period, did perform any substantial gainful activity;

2)    suffers from an impairment that is severe or whether a combination of his impairments is severe;

3)    suffers from an impairment or combination of impairments which meets or equals any impairment listed in the appendix and which meets the duration requirement;

4)    is unable to perform his past relevant work which includes an assessment of the claimant's residual functional capacity (RFC); and

5)    is unable to perform any other work existing in significant numbers in the national economy.

*Id.*

Here, Jamie argues that the record is "replete with [J.F.'s] significant cognitive deficits requiring extremely highly structured settings in order to learn" given his sensory modulation disorder. Plf's MSJ (Doc. 17 at pg. 82). She argues that there is no workplace that could meet the demands J.F. requires to learn and function; she says someone would have to stand over him to frequently redirect him to the task at hand. Jamie therefore argues the ALJ asked the VE hypothetical questions which included abilities J.F. does not have. The Commissioner argues that the ALJ reasonably assessed J.F.'s RFC, and she explained the bases for her RFC assessment by linking it to the record evidence and J.F.'s specific limitations. Just as the ALJ's determination that J.F. was not disabled prior to attaining the age of 18 is supported by substantial evidence, so too is the ALJ's determination that J.F. was not under a disability since the day he attained age 18 (November 12, 2016) through the date of the ALJ's June 11, 2018 Decision.

At Step Three of the adult disability analysis, the ALJ explained that J.F. did not meet or medically equal Listing 12.11 (which utilized the same criteria as Listing 112.11) given that J.F. had marked limitation in concentration, persistence,

or pace – just one of the four areas of mental functioning set forth in paragraph B of that listing. Because the Court already determined that the ALJ's medical equivalence findings as to Listing 112.11 are supported by substantial evidence, the ALJ's findings as to Listing 12.11 are likewise supported by substantial evidence. The ALJ additionally pointed out that consultative psychological examiner Dr. Lana's evaluation was the only medical record since J.F. attained the age of 18. Dr. Lana opined that J.F. had moderate limitation in understanding, remembering, and carrying out simple instructions and in the ability to make judgments on simple work-related decisions; marked limitation in understanding, remembering, and carrying out complex instructions; and an extreme limitation in the ability to make judgments on complex work-related decisions. The ALJ explained those opinions would be consistent with the ALJ's overall findings that J.F. had marked limitation in concentration, persistence, or pace, but only moderate limitations in understanding, remembering, and applying information and adapting or managing oneself. The ALJ considered evidence that J.F. worked hard on completing tasks in a small group setting, that J.F. played video and computer games suggesting he could understand and apply the rules to progress toward game goals, J.F. was provided accommodations including notification of change in routine and use of sensory strategies, and he tended to avoid activities with a lot of noise and/or people. Of note was J.F.'s demonstrated awareness of his challenges and his preference to avoid uncomfortable situations and that his ability to regulate his emotions and handle frustration appeared to have improved as he had gotten older, "although some difficulties still persist." AR 1123.

25

As for the greater limitations to which Dr. Lana opined[4], the ALJ explained that her assessment was not consistent with the other evidence of record, and the ALJ cited specific examples of inconsistency between J.F.'s and Jamie's testimony and J.F.'s reports to and conduct before Dr. Lana. Among other examples, the ALJ pointed out that Dr. Lana reported J.F. played with his tablet and avoided eye contact during the consultative evaluation whereas at the May 2018 hearing, J.F. did not utilize the tablet and was able to stay engaged in the hearing and communicate adequately. Next, the ALJ addressed J.F.'s and Jamie's testimony that he had extreme functional difficulties due to his sensory issues. The ALJ again considered that some of J.F.'s behaviors would not be atypical of teenagers, it was noted in October 2016 that J.F. generally got along well with peers and teaching staff, it was stated in December 2016 he was a friendly and talkative student, and it was noted that when he became agitated or upset he might become more prone to blurt things out impulsively. The ALJ's Step Three analysis is beyond reproach.

---

[4] Jamie questions why Dr. Lana was not provided with J.F.'s updated records, and she argues that "the fact remains" that Dr. Lana's evaluation results should carry great weight because even without J.F.'s records she properly aligned his conditions to that of what his teachers, psychologist, and therapist saw on a daily basis. The ALJ addressed Dr. Lana's statement in her evaluation that, "There are no recent records showing treatment or diagnoses or claim . . . There were no mental health records." AR 1129. The ALJ further detailed Jamie's challenge to that omission which questioned why the updated records she provided were not sent to Dr. Lana. The ALJ pointed out: 1) Jamie hand-delivered J.F.'s 2012-13 medical records and his high school records "well after DDS has scheduled the examination, and due to that delay it was not possible for DDS to supply those records to Dr. Lana; 2) there was not any compelling evidence that having those records would have resulted in Dr. Lana setting forth any greater functional limitations (2012-13 records provided no insight into mental functioning, there were no actual mental health records, no formal comprehensive evaluation by a school psychologist in recent years); and 3) even if Dr. Lana had access to school records, "the most likely outcome would be that she would have found the claimant less functionally limited, as the high school records do not support the degree of impairment she set forth based on the examination." AR 1130. Even if the Court were to find the ALJ erred by not ensuring Dr. Lana had the most up-to-date records, the error was harmless because the ALJ explicitly confronted that fact, explained it was not entirely due to the fault of DDS, and, most importantly, proceeded to consider the consistency of Dr. Lana's assessment with the evidence as a whole (the ALJ's obligation whether or not Dr. Lana had the additional evidence to which Jamie points). *See* 20 C.F.R. § 416.927(c)(3), (4) (providing that the consistency and supportability of a medical opinion will be considered in evaluating the weight to give that opinion)

Obviously, Jamie takes issue with that portion of the ALJ's RFC assessment, at Step Four, which limited J.F. to tasks learned within 30 days that are routine in nature; a low stress work environment, meaning no more than occasional decision-making or changes in work setting; no hourly production quotas; no interaction with the general public; no more than occasional interaction with coworkers or supervisors; tasks that could be easily resume after momentary distraction; no tandem tasks; and no concentrated exposure to excessive noise.    AR 1125. Specifically, Jamie takes issue with that assessment because she insists J.F.'s sensory issues preclude him from all work.    An RFC assessment "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8p; *see also Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001) ("In assessing the claimant's RFC, the ALJ must consider both the medical and nonmedical evidence in the record").

The ALJ yet again discussed J.F.'s and Jamie's hearing testimony as to the former's sensory issues, the fact that there were no treatment records since J.F. turned 18, there were no mental health records, Dr. Lana's evaluation in which she indicated it was unclear if J.F. had cognitive issues or for the lack of trying (the ALJ later cited to evidence suggesting a lack of trying), and inconsistencies in J.F.'s and Jamie's hearing testimony and other evidence of record (including observed behavior, school disciplinary records, teachers' assessments, daily activities).  Put simply, the ALJ carried over her discussion of the record evidence as it pertained to J.F.'s limitations before he turned 18 and considered that evidence alongside newer evidence (including Dr. Lana's evaluation).  The ALJ removed any question as to how the weight of the evidence factored into the RFC assessment where she narrated:

> [D]ue to the statements of the claimant and his mother regarding increased sensory issues when exposed to loud noisy environments, the claimant would need to be in a work setting that did not involve concentrated exposure to excessive noise.  Due to his learning disorder, the claimant would be restricted to tasks that can be learned within thirty days and that are routine in nature.  The claimant's significant difficulties in concentration, persistence, or maintenance of pace and his less significant but still problematic issues adapting or managing himself would warrant restrictions to a low stress work environment (meaning no more than occasional decision-making or changes in work setting) involving tasks that can be easily resumed after momentary distraction and with no hourly production quotas. Due to his difficulties with social interaction, the claimant should have no interaction with the general public in a work setting, no more than occasional interaction with coworkers or supervisors, and should not be required to perform tandem tasks.  Overall, the claimant has failed to establish that he would be unable to perform a limited range of essentially unskilled socially undemanding work if so motivated.

AE 1132-33.    That narrative succinctly connected the dots between J.F.'s impairments, specifically the limitations caused by those impairments which were supported by substantial evidence, and the mental RFC assessment.

Accordingly, Jamie's argument that the ALJ posed a hypothetical individual to the VE with abilities J.F. did not have fails.  As a general rule, both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record." *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014).  Because the ALJ's RFC assessment is substantially supported by the record evidence, and because the limitations in the RFC finding were presented to the VE, the ALJ committed no error.

## V

For the reasons set forth above, it is recommended that:  1) the Plaintiff's Motion for Summary Judgment (Doc. 17) be denied; 2) the Defendant's Motion for

Summary Affirmance (Doc. 18) be granted; 3) The Clerk of Court be directed to enter judgment as follows: "IT IS ORDERED AND ADJUDGED that the decision of the Defendant, Andrew Saul, Commissioner of Social Security, denying benefits to the Plaintiff, JAMIE C., on behalf of J.F., is AFFIRMED."; and 4) this matter be terminated.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk within fourteen (14) days after service of this Report and Recommendation. FED. R. CIV. P. 72(b)(2); 28 U.S.C. § 636(b)(1). Failure to object will constitute a waiver of objections on appeal. *Johnson v. Zema Systems Corp.*, 170 F.3d 734, 739 (7th Cir. 1999); *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 330 (7th Cir. 1995).

*It is so recommended.*

Entered on August 17, 2020.

<u>s/Jonathan E. Hawley</u>
U.S. MAGISTRATE JUDGE